UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

———————————————————
                                                       )
UNITED STATES ex rel.                                  )
MARTIN FLANAGAN,                                       )
                                                       )
        Plaintiff-Relator,                             )
                                                       )        Civil Action No.
        v.                                             )        21-11627-FDS
                                                       )
FRESENIUS MEDICAL CARE                                 )
HOLDINGS, INC., d/b/a                                  )
FRESENIUS MEDICAL CARE                                 )
NORTH AMERICA,                                         )
                                                       )
        Defendant.                                     )
———————————————————)


MEMORANDUM AND ORDER ON
DEFENDANT'S MOTION TO DISMISS

SAYLOR, C.J.

        This is a *qui tam* action alleging violations of the Anti-Kickback Statute, 42 U.S.C. §

1320a-7b, and False Claims Act, 31 U.S.C. §§ 3729 et seq., by a company that provides dialysis

services to patients with kidney failure.  Relator Martin Flanagan has brought suit against

defendant Fresenius Medical Care Holdings, Inc., d/b/a Fresenius Medical Care North America

("FMCNA"), alleging that FMCNA improperly provided free or below-cost services to hospitals

and physicians, and made various types of improper payments to physicians, in exchange for

referrals to its dialysis clinics.  The complaint alleges that FMCNA violated the Anti-Kickback

Statute ("AKS") and caused the submission of false claims for payment to Medicare, Medicaid,

and other government health-care payors.

        FMCNA has moved to dismiss the complaint for failure to state a claim upon which relief

can be granted pursuant to Fed. R. Civ. P. 12(b)(6) and for failure to allege fraud with

particularity as required by Fed. R. Civ. P. 9(b).

The False Claims Act permits relators to reap substantial awards for reporting false claims to the government—in this case, the relator could conceivably recover billions of dollars if his allegations are proved.  The statute has a variety of strict requirements, however, that serve both to ensure that the government has a fair opportunity to control the litigation and to screen out claims that are incomplete, redundant, or parasitic.  Here, the motion to dismiss presents three sets of issues, all arising from the strict requirements for pleading such claims.

The first issue is whether relator complied with the requirements of the False Claims Act to notify the government of his claims prior to filing suit.  *See* 31 U.S.C. § 3730(b)(2).  Relator did comply with that requirement before filing his original complaint, which was 22 pages long and described an illegal scheme with two essential components.  He did not do so, however, before filing his amended complaint, which is 147 pages long and contains a number of substantially new allegations of different components of the scheme.  Because he did not present those new claims to the government, that portion of the amended complaint alleging false claims based on that conduct will be dismissed.

The second issue is whether the public-disclosure bar of the statute precludes all or any of the claims—that is, whether relator is filing suit concerning matters that had been previously disclosed to the public.  *See* 31 U.S.C. § 3730(e)(4)(A).  Under the circumstances, the Court concludes that the bar does not apply.

The third, and perhaps most difficult, issue is whether the amended complaint pleads fraud with sufficient particularity to meet the requirements of Fed. R. Civ. P. 9(b).  As is often the case with *qui tam* actions, the issue is not whether the complaint alleges an unlawful scheme—it does, in considerable detail—but whether it actually pleads a violation of the False

Claims Act. To do so, the complaint must both allege the existence of a scheme to defraud and identify particularized false claims. It is insufficient to allege a scheme and then to make generalized allegations that the scheme must have, as a matter of logic, resulted in false claims.

Here, despite its length, the amended complaint does not describe a single particular false claim. Instead, it alleges that FMCNA paid kickbacks for referrals on a widespread basis, and that therefore "all" claims for payment that it submitted to the government were false. It also provides a very limited amount of statistical evidence to attempt to bolster those allegations. The central issue is whether relator can sidestep the requirement to plead false claims with particularity by alleging that every single claim is necessarily false. Under the circumstances presented here, the Court concludes that he cannot.

Accordingly, and for the following reasons, the motion to dismiss will be granted.

## I.   Background

Unless otherwise noted, the following facts are alleged in the amended complaint.

### A.   The Parties

FMCNA is a wholly-owned subsidiary of Fresenius Medical Care AG & Co. KGaA, which is located in Bad Homburg, Germany. (Am. Compl. ¶ 13). FMCNA is headquartered in Waltham, Massachusetts. (*Id.*). It employs more than 40,000 employees and treats nearly 190,000 patients at approximately 2,400 outpatient clinics in the United States, including 39 in Massachusetts. (*Id.*). It also contracts with hospitals to provide dialysis services on an outpatient basis. (*Id.*).

Martin Flanagan is a resident of Texas. (*Id.* ¶ 11). He was employed by Fresenius for 29 years. (*Id.*). His last title was Director of Acute Market Development for the Fresenius Western Business Unit. (*Id.*). In that role, he was responsible for, among other duties, negotiating

contracts under which FMCNA provided dialysis treatment to hospital inpatients.  (*Id.*).

    **B.**    <u>**Factual Background**</u>

Chronic kidney disease refers to the progressive loss of a person's kidney function, which is normally irreversible.  (*Id.* ¶ 14).  End-Stage Renal Disease ("ESRD") is the stage of advanced kidney impairment that requires either continued dialysis treatments or a kidney transplant to sustain life.  (*Id.* ¶ 15).  Dialysis refers to a treatment regimen aimed at artificially replacing some of the functions performed by a healthy kidney.  (*Id.* ¶ 17).  According to the United States Renal Data System, there were approximately 746,557 ESRD patients in the United States at the end of 2017.  (*Id.* ¶ 15).  Roughly 90% of all dialysis patients undergo hemodialysis at a dialysis clinic three times per week.  (*Id.* ¶ 18).  FMCNA is America's largest dialysis-services provider.  (*Id.* ¶ 13).

Medicare is a federally-funded health-insurance program that primarily provides benefits to the elderly, but also provides coverage to patients with ESRD, regardless of age.  (*Id.* ¶ 19).  The Medicare ESRD program is administered through the Centers for Medicare & Medicaid Services ("CMS"), an agency within the Department of Health and Human Services ("HHS").  (*Id.* ¶ 25).  Since 1972, Medicare has been the primary payor for more than 80% of the cost of dialysis treatment for nearly 800,000 ESRD patients in the United States.  (*Id.* ¶ 22).  ESRD expenditures by Medicare exceed $40 billion annually.  (*Id.* ¶ 23).

According to the complaint, FMCNA clinics and other providers treating ESRD submit to the government one reimbursement claim bill per month for each patient, including the charges for several dialysis treatments, any separately billable laboratory services, and separately billable drugs.  (*Id.* ¶ 28).

Medicaid is a state-administered program where each state sets its own guidelines

concerning eligibility and services, with funding coming jointly from the states and the federal government.  (*Id.* ¶ 38).  In many states, Medicaid pays for treatment costs for ESRD patients who do not qualify for Medicare and/or pays for the 20% of treatment costs not covered by Medicare.  (*Id.* ¶ 45).  Submission of claims to Medicaid that were ineligible for payment because of violation of the AKS are actionable under the FCA because the payments of those claims were made with federal funds.  (*Id.* ¶ 44).

In addition to Medicare and Medicaid, CHAMPUS/TRICARE, which is administered by the United States Department of Defense, provides ESRD benefits to health-care programs for individuals and dependents affiliated with the armed forces and to covered beneficiaries.  (*Id.* ¶ 35).  CHAMPVA, which is administered by the United States Department of Veterans Affairs, is a health-care program for families of veterans with 100% service-connected disabilities and provides ESRD benefits to covered beneficiaries.  (*Id.*).

### C.    FMCNA's Allegedly Improper Conduct

The complaint alleges various methods by which FMCNA improperly induced the referral of patients to its dialysis clinics.  First, it alleges that FMCNA offered remuneration to hospitals in two ways:  by entering into contracts that provided no-cost and/or below-cost inpatient dialysis services, and by providing "significant" free services, including free discharge-planning services, free in-service training to staff, free training to patients, and free quality assessment and improvement data analysis to hospitals.  (*Id.* ¶¶ 81-166).  Second, it alleges that FMCNA engaged in improper remuneration relationships with physicians who served as medical directors in its outpatient clinics in five ways:  by selecting medical directors based on their expected and historical referrals; by paying them above-market compensation to reward referrals; by making no effort to report or verify their hours; by tracking their referrals to make

5

sure they were not making referrals to competitors; and by requiring them to sign onerous non-compete agreements to lock them into their arrangements with FMCNA.  (*Id.* ¶¶ 167-307).  Third, it alleges that FMCNA provided physicians free or below-cost practice-management services.  (*Id.* ¶¶ 308-20).  Fourth, it alleges that FMCNA entered into favorable leases with medical directors that paid them above-market rates.  (*Id.* ¶¶ 321-31).  Fifth, it alleges that FMCNA entered into favorable joint-venture agreements ("JVAs") with physician groups to induce them to make referrals.  (*Id.* ¶¶ 332-75).

### 1.    <u>Hospital Services</u>

According to the complaint, over the past two decades, the dialysis industry has become increasingly concentrated in the hands of two companies:  DaVita and FMCNA.  (*Id.* ¶ 84).  Beginning in approximately 2007, FMCNA allegedly realized that the company's "organic growth" (that is, growth from adding new patients and not through acquisitions) was almost non-existent.  (*Id.* ¶ 85).  FMCNA decided that one of the keys to capturing new patients for its dialysis clinics was through its relationships with hospitals providing inpatient acute care.

### a.    <u>Below-Cost Dialysis Services</u>

The complaint alleges that FMCNA made a calculated business decision to offer inpatient dialysis services to hospitals at prices well below cost in order to capture referrals of discharged patients to its dialysis clinics.  (*Id.* ¶ 83).  Flanagan and his colleagues were allegedly instructed by their superiors to obtain hospital contracts "at any cost" to secure the referrals of discharged patients.  (*Id.* ¶ 88).  Bonuses and performance evaluations for mid-level managers were tied, in part, to patient growth and the increase in number of treatments at individual clinics.  (*Id.* ¶ 89).

According to the complaint, FMCNA budgeted for the anticipated losses in the acute programs at many of the larger hospitals.  (*Id.* ¶ 90).  Internal spreadsheets from the Western

Business Unit show that FMCNA recorded losses on its contracts with hospitals, often in excess of the budgeted losses. (*Id.* ¶¶ 91, 93). Although the budgetary spreadsheets were reviewed and approved by mid-level and upper management, the complaint alleges that the decision to run hospital programs at a loss was made by corporate management. (*Id.* ¶ 93). It alleges that Flanagan and colleagues were directed by their superiors to pursue contracts even when they resulted in losses. (*Id.* ¶¶ 97-106). And it further alleges that Flanagan was instructed not to enforce "escalator" clauses, which called for annual fee increases of up to 4.0%. (*Id.* ¶¶ 110-11).

### b.   Free Services to Hospitals and Patients

The complaint alleges that FMCNA provided free discharge-planning services to hospitals, free in-service training to staff, free training to patients, and free quality assessment and improvement program data analysis. (*Id.* ¶ 128). FMCNA also established the Bridge Program, allegedly to "help hospitals save money by streamlining the process for patient discharge from the hospital and admission to a chronic facility for dialysis." (*Id.* ¶ 131). The complaint alleges that the Bridge Program was actually designed to capture all of a hospital's referrals, as "about half of the company's patients came into [FMCNA] clinics via [the discharge planning process]." (*Id.* ¶¶ 132, 140). FMCNA tracked the referrals recorded as part of the Bridge Program. (*Id.* ¶ 162). It alleges that although FMCNA directed that "all services provided under the Bridge Program must be provided at FMV," Flanagan was never required to obtain an FMV analysis for any hospital contract or for Bridge Program services during his tenure with the company. (*Id.* ¶¶ 142-43). Instead, those services were provided free of charge. (*Id.*).

### 2.   Medical Director Compensation

By law, all outpatient dialysis clinics must have a qualified medical director "to be

responsible for the delivery of patient care and outcomes in the facility."  42 C.F.R. § 494.150;

Am. Compl. ¶ 170.  Medical directors are not FMCNA employees, but physicians in private

practice.

The complaint alleges that FMCNA engaged in improper remunerative relationships with

medical directors in its outpatient clinics to capture their referrals.  (Am. Compl. ¶¶ 167-69).  It

alleges that FMCNA courted nephrologists in multi-physician private practices with high

numbers of patients to be medical directors, often offering to pay them more than $100,000

annually in exchange for patient referrals.  (*Id.* ¶ 176).

According to the complaint, FMCNA pitched medical-director positions to nephrologists

as a way "to earn a considerable income for little or no investment of time."  (*Id.* ¶ 181).  A

medical director's "productivity" was tracked, and contracts with medical directors who

generated a large number of patients were renewed.  (*Id.* ¶¶ 184-97).  Patients who were referred

to non-FMCNA clinics were categorized as "leakage."  (*Id.* ¶ 217).  FMCNA generated reports

to track which medical directors and their practice groups referred patients to outside clinics and

the reasons why.  (*Id.*).

The complaint further alleges that FMCNA paid its medical directors far above fair

market value.  (*Id.* ¶¶ 198-205).  For example, medical directors at 160 FMCNA clinics made

more than $300,000 in 2019, well above the average compensation of medical directors at

similarly located clinics.  (*Id.*).  And even though the regulatory guidance defines the medical-

director position as occupying 0.25 FTE, the complaint alleges that FMCNA neither tracked nor

enforced medical directors' hours spent on duties to their clinics.  (*Id.* ¶¶ 172, 206-13).

Finally, the complaint alleges that medical directors were required to sign agreements

containing non-competition provisions in order to preclude any medical director and those in the

same practice group from engaging in any remunerative relationship with another dialysis company.  (*Id.* ¶ 223).  Physicians who wanted to terminate the non-competition agreements were forced to negotiate onerous buyouts.  (*Id.* ¶ 228).

### 3. Free or Below-Cost Management Services

The complaint further alleges that FMCNA provided free or below-cost services to physicians to secure referrals.  (*Id.* ¶¶ 308, 321).  According to the complaint, FMCNA offered physicians the opportunity to enter into free practice-management agreements, in return for which it obtained the practice's data from the prior three to five years.  It then used that data to identify physicians and practice groups to target for medical director positions and joint-venture agreements.  (*Id.* ¶¶ 308-14).

### 4. Favorable Leases

According to the complaint, FMCNA also paid physician groups rent above fair market value and provided leases below fair market value in order to secure referrals.  (*Id.* ¶ 331).

### 5. Joint-Venture Agreements

Finally, the complaint alleges that FMCNA entered into joint-venture agreements with physicians in order to induce referrals to the joint-venture clinic.  (*Id.* ¶ 332).  According to the complaint, FMCNA paid inflated amounts for controlling interests in the joint venture while selling shares below fair market value to physicians who were in a position to make referrals. (*Id.* ¶¶ 334-35).  Moreover, referral sources were routinely permitted to own more than 40% of the joint venture investment, contrary to HHS OIG guidance.  (*Id.* ¶¶ 332-36).  The complaint further alleges that FMCNA would typically pay high-performing physicians 10 to 12% of the clinic's topline revenue, whereas it would pay lower-performing physicians up to 6% of topline revenue.  (*Id.* ¶ 343).  FMCNA also inserted non-competition clauses into their JVAs in order to

lock partners into referring patients to its facility.  (*Id.* ¶¶ 368-74).

**D.     Procedural Background**

Flanagan filed the original complaint on March 6, 2014, alleging presentation of false claims in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A) (Count 1); making or using false records material to a false or fraudulent claim in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B) (Count 2); and conspiring to present false claims and making or using false records material to a false or fraudulent claim in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(C) (Count 3).  Essentially, that version of the complaint alleged that FMCNA's efforts to incentivize referrals to its clinics violated the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), and the resulting claims to Medicare were tainted by illegal kickbacks in violation of the False Claims Act.

After a review of the claims, the government declined to intervene.  FMCNA then moved to dismiss the complaint.  In response, relator filed an amended complaint.

FMCNA has moved to dismiss the amended complaint on the grounds that (1) the amended complaint is essentially a new complaint and should therefore have been filed under seal as required by 31 U.S.C. § 3730(b)(2); (2) the claims are barred by the FCA public-disclosure bar, 31 U.S.C. § 3730(e)(4); (3) the claims concerning joint-venture agreements are barred by the FCA's first-to-file bar, 31 U.S.C. § 3730(b)(5); (4) the complaint has not pleaded fraud with particularity as required by Rule 9(b); and (5) the complaint fails to state a claim for FCA conspiracy.

**II.     Standard of Review**

On a motion to dismiss, the court "must assume the truth of all well-plead[ed] facts and give . . . plaintiff the benefit of all reasonable inferences therefrom."  *Ruiz v. Bally Total Fitness*

*Holding Corp.*, 496 F.3d 1, 5 (1st Cir. 2007) (citing *Rogan v. Menino*, 175 F.3d 75, 77 (1st Cir. 1999)).  To survive a motion to dismiss, the complaint must state a claim that is plausible on its face.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  That is, "[f]actual allegations must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  *Id.* at 555 (citations omitted). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 556).  Dismissal is appropriate if the complaint fails to set forth "factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory."  *Gagliardi v. Sullivan*, 513 F.3d 301, 305 (1st Cir. 2008) (quoting *Centro Medico del Turabo, Inc. v. Feliciano de Melecio*, 406 F.3d 1, 6 (1st Cir. 2005)).

Under Rule 9(b), the standard for allegations of fraud is higher than the normal pleading standard.  To survive a motion to dismiss, a complaint alleging fraud must "state with particularity the circumstances constituting fraud."  Fed. R. Civ. P. 9(b).

### III.   **The Regulatory Framework**

The False Claims Act, 31 U.S.C. §§ 3729-33, provides for civil liability for anyone who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" or "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."  31 U.S.C. § 3729(a)(1)(A), (a)(1)(B).  A "claim" is "any request or demand . . . for money or property" presented to an officer, employee, or agent of the United States.  31 U.S.C. § 3729(b)(2).  Private persons, known as relators, can file civil *qui tam* actions on behalf of the United States against persons or entities who violate the act.  *Id.*

§ 3730(b).  The government can intervene in a *qui tam* action and assume primary responsibility

over it.  *Id.* § 3730(b)(2), (b)(4), (c)(1).  The relator is eligible to collect a portion of any damages

awarded in a *qui tam* action, whether or not the government intervenes.  *Id.* § 3730(d).

The Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, states that "whoever knowingly and

willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or

indirectly, overtly or covertly, in cash or in kind to any person to induce such person . . . to

purchase . . . or recommend purchasing . . . any good, facility, service, or item for which

payment may be made in whole or in part under a Federal health care program" shall be guilty of

a felony.  42 U.S.C. § 1320a-7b(b)(2).  In 2010, Congress amended the AKS to clarify that any

Medicare claim "that includes items or services resulting from a violation of [the AKS]

constitutes a false or fraudulent claim for the purposes of [the FCA]."  42 U.S.C. § 1320a-7b(g);

Patient Protection and Affordable Care Act, Pub. L. No. 111-148, 124 Stat. 119 (2010).  In other

words, "an AKS violation that results in a federal health care payment is a per se false claim

under the FCA."  *Guilfoile v. Shields*, 913 F.3d 178, 190 (1st Cir. 2019) (quoting *U.S. ex rel.

Lutz v. United States*, 853 F.3d 131, 135 (4th Cir. 2017)).

**IV.     Analysis**

**A.     Mandatory Pre-Suit Requirements**

Defendant contends that the amended complaint should be dismissed for failure to

comply with the pre-suit requirements of the FCA, 31 U.S.C. § 3730(b)(2).

Under the FCA, a relator must comply with the following requirements:

> A copy of the complaint and written disclosure of substantially all material
> evidence and information the person possesses shall be served on the
> Government . . . .  The complaint shall be filed in camera, shall remain under seal
> for at least 60 days, and shall not be served on the defendant until the court so
> orders.  The Government may elect to intervene and proceed with the action
> within 60 days after it receives both the complaint and the material evidence and

information.

31 U.S.C. § 3730(b)(2).

Those notification requirements were enacted "to allow the Government an adequate opportunity to fully evaluate the private enforcement suit and determine both if that suit involves matters the Government is already investigating and whether it is in the Government's interest to intervene and take over the civil action." *United States ex rel. Pilon v. Martin Marietta Corp.*, 60 F.3d 995, 998-99 (2d Cir. 1995) (quoting S. Rep. No. 99-345, 1986 U.S.C.C.A.N. 5266, 5289). "A secondary objective was to prevent defendants from having to answer complaints without knowing whether the government or relators would pursue the litigation." *Id.* at 999. Accordingly, "[f]ailure to comply with these mandatory threshold requirements warrants dismissal of the *qui tam* complaint with prejudice." *United States ex rel. Stevens v. Vermont Agency of Nat. Res.*, 162 F.3d 195, 200 (2d Cir. 1998) (*rev'd on other grounds*, 529 U.S. 765 (2000)).

If the government declines to intervene and the *qui tam* case is unsealed, further proceedings are governed by 31 U.S.C. § 3730(c)(3). That statute provides:

> If the Government elects not to proceed with the action, the person who initiated the action shall have the right to conduct the action. If the Government so requests, it shall be served with copies of all pleadings filed in the action and shall be supplied with copies of all deposition transcripts (at the Government's expense). When a person proceeds with the action, the court, without limiting the status and rights of the person initiating the action, may nevertheless permit the Government to intervene at a later date upon a showing of good cause.

31 U.S.C. § 3730(c)(3).

The policy behind that requirement—allowing the government to investigate the claims and decide whether to intervene—is implicated when a relator amends a complaint to add completely new FCA claims. *See East Bay Mun. Util. Dist. v. Balfour Beatty Infrastructure,*

*Inc.*, 2014 WL 2611312, at *2 (N.D. Cal. June 11, 2014).  Courts have therefore required relators to abide by those requirements when filing an amended complaint that is not "substantially similar" to the original complaint.  *Id.* at *3 (collecting cases).  For example, in *United States ex rel. Wilson v. Bristol-Myers Squibb, Inc.*, 750 F.3d 111 (1st Cir. 2014), the First Circuit affirmed the denial of a motion to amend the complaint a third time.  750 F.3d at 120.  The proposed amendments in that case were completely new allegations from a new *qui tam* plaintiff.  *United States ex rel. Wilson v. Bristol-Myers Squibb, Inc.*, 2011 WL 2462469, at *6-7 (D. Mass. June 16, 2011).  The district court had found that the relators had violated the filing and service requirements of the FCA because the new allegations were not substantially similar to those in the original complaint.  *Id.*  In affirming that decision, the First Circuit stated that "the new paragraphs in the [p]roposed [complaint] were attributable to the new relator and . . . they [therefore] violated the FCA's filing and service requirements."  *Wilson*, 750 F.3d at 120.

    Here, the original complaint was 22 pages long and contained 54 numbered paragraphs. The description of the alleged scheme consisted of 25 paragraphs.  Of those, thirteen described a scheme "to offer dialysis services to hospitals well below cost in order to capture referrals." (Compl. ¶ 26).  Another six described a scheme involving "improper remuneration relationships with physicians who serve as medical directors at Fresenius clinics."  (*Id.* ¶ 39).  It alleged that "[t]hese problematic physician relationships generally break down into two areas."  (*Id.*).  The first was that "these physicians were generally paid in excess of fair market value for the services they actually rendered."  (*Id.*).  The second was that "these same doctors are often provided with opportunities to rent office space that they own to Fresenius at above or at the very top of fair market value," with guaranteed long-term leases that are "not commercially reasonable."  (*Id.*

¶ 40).[1]

The original complaint referred to joint-venture agreements between FMCNA and physicians, but only in order to contrast such agreements (which it referred to as a product of "arms-length negotiations") with the higher compensation paid to medical directors in the absence of such agreements.  (*Id.* ¶ 41 ("The fact that medical director compensation is lower where the physician actually shares the cost of his or her compensation through his or her joint venture (ownership) agreement shows that where there are arms-length negotiations between two more or less equal parties, a lower compensation rate results.")).  It did not allege that FMCNA improperly provided free services to hospitals and patients in the form of free discharge-planning services, free in-service training to staff, free training to patients, and free quality assessment and improvement program data analysis, nor did it mention the Bridge Program.  And it did not allege that FMCNA provided free or below-cost practice-management services to physicians.

The initial complaint has since been amended to add 125 pages of allegations, including multiple new claims.  Defendant correctly contends that the initial complaint did not contain any allegations concerning unlawful joint-venture agreements, or the provision of free services to hospitals, physicians, and patients.  The portions of the claims based on those allegations will therefore be dismissed for failing to comply with the FCA's pre-suit requirements.

Defendant further contends that the original complaint did not contain any allegations concerning medical-director agreements, and that all claims based on such agreements should likewise be dismissed.  While it is true that it did not use the term "medical director agreements," its allegations concerning improper remuneration to physicians in the form of compensation

---

[1] The remaining six paragraphs describing the alleged scheme consisted of an introductory paragraph (Compl. ¶ 25) and five paragraphs addressing how the scheme resulted in false claims (*Id.* ¶¶ 45-49).

above fair-market value and favorable leases are nonetheless "substantially similar" to those in the amended complaint.  To the extent that the amended complaint addresses those remuneration relationships, therefore, the claims will not be dismissed.

In summary, because the new allegations concerning (1) joint-venture agreements, (2) free services to hospitals and patients, and (3) free practice-management services to physicians are not substantially similar to the allegations in the initial complaint, that portion of the complaint will be dismissed for failure to comply with the filing and service requirements of the FCA.  *See Wilson*, 2011 WL 2462469, at *7.

### B.        The Public-Disclosure Bar

Defendant next contends that the remaining FCA claims in the amended complaint are barred by the public-disclosure bar of the statute, 31 U.S.C. § 3730(e)(4)(A).

The *qui tam* provisions of the FCA permit relators, in some instances, to reap huge financial windfalls.  "Although this financial incentive encourages would-be relators to expose fraud, it also attracts parasitic relators who bring FCA damages claims based on information within the public domain or that the relator did not otherwise discover."  *United States ex rel. Duxbury v. Ortho Biotech Prods., L.P.*, 719 F.3d 31, 33 (1st Cir. 2013) ("*Duxbury II*") (internal quotation marks and citations omitted).

To strike a balance between encouraging whistle-blowing and discouraging opportunistic behavior, the FCA contains a "public-disclosure bar."  *Id.*  The public-disclosure bar seeks to "prevent parasitic qui tam actions in which relators, rather than bringing to light independently discovered information of fraud, simply feed off of previous disclosures of public fraud."  *United States ex rel. Duxbury v. Ortho Biotech Prods., L.P.*, 579 F.3d 13, 26 (1st Cir. 2009) ("*Duxbury I*").

The public-disclosure bar provides as follows:

The Court shall dismiss an action or claim under this section, unless opposed by the Government, if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed—

    i.   in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party;

    ii.  in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; or

    iii.  from the news media,

unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

31 U.S.C. § 3730(e)(4)(A).

The public-disclosure bar of § 3730(e)(4)(A) applies when "(1) a public disclosure of the allegations or transactions in a relator's complaint . . . occurred; (2) said disclosure . . . occurred in the manner which is specified in the FCA; and (3) the relator's suit [is] 'based upon' those publicly disclosed allegations or transactions."  *U.S. ex rel. Est. of Cunningham v. Millennium Lab'ys of Cal., Inc.*, 713 F.3d 662, 669-70 (1st Cir. 2013) (quoting *Duxbury I*, 579 F.3d at 21).

A prior, public disclosure of fraud occurs when the essential elements exposing the particular transaction as fraudulent find their way into the public domain.  To be a disclosure of fraud the disclosure must contain either (1) a direct allegation of fraud, or (2) both a misrepresented state of facts and a true state of facts so that the listener or reader may infer fraud.

*U.S. ex rel. Poteet v. Bahler Med., Inc.*, 619 F.3d 104, 110 (1st Cir. 2010) (internal quotation marks and citations omitted).

The statute defines "original source" as an individual who, "[1] prior to a public disclosure . . . has voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based, or (2) who has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions . . . ."  31 U.S.C. §

17

3730(e)(4)(B).

Here, defendant contends that the allegations were previously disclosed in multiple ways, including a 2005 government investigation and a 2005 Corporate Integrity Agreement ("CIA") between FMCNA and the Office of Inspector General of the Department of Health and Human Services ("OIG").

### 1.    Compensation of Medical Directors

Defendant contends that the allegations concerning the compensation of medical directors were publicly disclosed prior to the filing of the complaint.

First, defendant contends that the salaries paid to all of its medical directors is a matter of public record and is available on the website of the Center for Medicare and Medicaid Services ("CMS").  While it is true that CMS data are "reports" for the purposes of the public disclosure bar, *see U.S. ex rel. Conrad v. Abbott Lab'ys, Inc.*, No. 02-11738, 2013 WL 682740, at *5 (D. Mass. Feb. 25, 2013), the mere publication of compensation information, without an allegation of fraud or misrepresentation, is not sufficient to trigger the bar.

Second, defendant contends that a complaint alleging medical-director fraud filed in Missouri in 2005 against two different companies—both of which were later acquired by FMCNA—qualified as a public disclosure barring the current allegations.[2]  Defendant further contends that the CIA it had entered into with the OIG relating to conduct of a company FMCNA later acquired (National Medical Care) qualified as a public disclosure.

Those arguments, however, are unavailing.  The 2005 complaint alleged improper conduct dating from a decade before the conduct alleged here.  Furthermore, the defendants in

---

[2] The *qui tam* action at issue was *United States ex rel. Williams v. Renal Care Grp., et al.*, No. 4:05-cv-985 (E.D. Mo. June 21, 2005).

that case were entities that at the time were not affiliated with FMCNA.  Allegations concerning

pre-merger conduct cannot be said to have disclosed post-merger conduct.  *See U.S. ex rel.*

*Saldivar v. Fresenius Med. Care Holdings, Inc*., 906 F. Supp. 2d 1264, 1274 (N.D. Ga. 2012).

Third, defendant contends that relevant public disclosures occurred in multiple SEC

filings by FMCNA.  The SEC filings at issue state that (1) "at most of our clinics, a relatively

small number of physicians account for the referral of all or a significant portion of the patient

base," (Def. Mem. Ex. 29 at 10); (2) "compensation is negotiated individually [based on] local

factors . . . . We believe that the compensation of our medical directors is in line with the

market" (*Id.* Ex. 13 at 23); and that (3) "If physicians and other referral sources cease referring

patients to our dialysis clinics . . . our revenues would decrease." (*Id.* Ex. 29 at 10).[3]

In *United States ex rel. CKD Project, LLC v. Fresenius Med. Care Holdings, Inc.*, 551 F.

Supp. 3d 27, 43 (E.D.N.Y. 2021), the court found that SEC filings disclosing the nature of the

joint-venture relationships and the regulatory risks associated with them were sufficient to

qualify as public disclosures.  The following is a relevant excerpt from an SEC filing cited by the

court in *CKD*:

> A number of the dialysis centers . . . we operate are owned, or managed, by joint ventures
> in which we hold a controlling interest and one or more hospitals, physicians or physician
> practice groups hold a minority interest.  Physician owners, who are usually
> nephrologists, may also provide medical director services and physician owners may
> refer patients to those centers or other centers we own and operate or to other physicians
> who refer patients to those centers or other centers we own and operate.  While we have
> structured our joint ventures to comply with many of the criteria for safe harbor
> protection under the U.S. Federal Anti-Kickback Statute, our investments in these joint
> venture arrangements do not satisfy all elements of such safe harbor.  While we have
> established comprehensive compliance policies, procedures and programs to ensure
> ethical and compliant joint venture business operations, if one or more of our joint
> ventures were found to be in violation of the Anti-Kickback Statute or the Stark Law, we

---

[3] The Court takes judicial notice of the proffered SEC filings as undisputed documents provided by the
parties in connection with a Rule 12(b)(6) motion based on the public-disclosure bar.  *United States ex rel.
Winkelman v. CVS Caremark Corp.*, 827 F.3d 201, 208 (1st Cir. 2016).

could be required to restructure or terminate them.  We also could be required to repay to Medicare amounts received by the joint ventures pursuant to any prohibited referrals, and we could be subject to criminal and monetary penalties and exclusion from Medicare, Medicaid and other U.S. federal and state healthcare programs.

(Def. Mem. Ex. 15 at 6).

That excerpt discloses that the joint ventures do not qualify for safe-harbor protection and identifies the penalties that might be imposed should the company be found to be in violation of the relevant statutes.  By contrast, here the statements in defendant's securities filings concerning medical-director agreements do not even convey the possibility that those agreements might violate the law.  Furthermore, they do not directly disclose the existence of any of the alleged schemes, or any other form of fraud, nor do they describe facts from which the existence of a fraudulent scheme might be inferred.  At most, the filings describe a set of circumstances that might be vulnerable to manipulation.

Accordingly, the public-disclosure bar does not preclude the claims concerning unlawful medical-director agreements.

### 2.    Joint-Venture Agreements

The Court has previously determined that the portion of the amended complaint that alleges claims arising out of the joint-venture agreements and the provision of free services to physicians will be dismissed for failure to comply with the pre-suit requirements of the False Claims Act.  However, even assuming compliance with those requirements, the claims concerning joint-venture agreements would be barred in any event.  Relator first alleged fraud concerning joint ventures in the amended complaint, which was filed in 2021.  Therefore, the court may consider any public disclosures made prior to 2021 for purposes of determining whether the claims are prohibited by the public-disclosure bar.

In 2014, a *qui tam* action was filed in the Eastern District of New York alleging that

FMCNA "acquired controlling interests in dialysis clinics" and paid physician owners "above-market value for their clinics and that this excess constituted payment to induce the doctors to refer patients back to these clinics." *U.S. ex rel. CKD Project v. FMCNA*, No. 14-cv-6646 (E.D.N.Y. Nov. 12, 2014) (ECF No. 1).  In substance, the complaint alleged that FMCNA engaged in a scheme to pay kickbacks to physicians with whom it had entered into joint-venture agreements.  The matter was unsealed, and therefore publicly disclosed, in 2018.  The amended complaint in this case, which was the first time relator raised any allegations concerning joint ventures, was filed three years later, in 2021.

"In assessing whether a given later-filed suit is 'based upon' publicly disclosed allegations, [courts] look to whether those allegations are 'substantially similar' to said allegations." *Cunningham*, 713 F.3d at 670.  Here, the allegations are "substantially similar" to those in *CKD* and are thus "based upon" the public disclosures.

However, even if allegations are based upon public disclosures, claims may nonetheless be asserted if the relator is an "original source."  Before 2010, the statute defined an "original source" as "an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information."  31 U.S.C. § 3730(e)(4)(B) (2006).  The 2010 Patient Protection and Affordable Care Act amendment to the public-disclosure bar made two notable changes to that definition.  *See* Pub. L. No. 111-148, § 10104(j)(2), 124 Stat. 119 (2010).  First, it added a second definition for "original source."  *Id.* Now, a relator may also qualify as an "original source" if "prior to a public disclosure under subsection (e)(4)(a), [he] voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based."  *Id.*  Second, the requirement for "direct"

knowledge was replaced with the requirement that a relator's knowledge must "materially add[ ] to the publicly disclosed allegations or transactions." *Id.* Thus, the statute now defines "original source" as an individual who

> (1) prior to a public disclosure . . . has voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based, or (2) who has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and who has voluntarily provided the information to the government before filing an action under this section.

31 U.S.C. § 3730(e)(4)(B).

The allegations in *CKD* described a scheme whereby FMCNA allegedly paid kickbacks to doctors with whom it had entered into joint-venture agreements. Relator's allegations here describe the same essential scheme and do not "materially add" to those allegations. At most, relator "merely adds detail or color to previously disclosed elements of an alleged scheme [which] is not materially adding to the public disclosures." *United States ex rel. Winkelman v. CVS Caremark Corp.*, 827 F.3d 201, 213 (1st Cir. 2016).

Accordingly, even if relator had complied with the pre-suit requirements of the False Claims Act, the public-disclosure bar would preclude the claims concerning joint-venture agreements.

### C.      The First-to-File Bar

Defendant also contends that the claims concerning joint-venture agreements are barred by the first-to-file rule. Again, those claims will be dismissed on other grounds; however, even if those claims survived those challenges, they are duplicative of the allegations in *CKD* and therefore would be barred by the first-to-file rule.

The first-to-file bar provides that "[w]hen a person brings an action . . . no person other than the Government may intervene or bring a related action based on the facts underlying the

pending action."  31 U.S.C. § 3730(b)(5).  Defendant contends that the 2014 *CKD* complaint alleged the same fraudulent scheme concerning joint-venture agreements as the amended complaint here, which was filed seven years later.  Relator responds that (1) the complaints do not allege the same essential facts and (2) the *CKD* complaint was later dismissed on jurisdictional grounds, which makes the first-to-file bar inapplicable.

The first question, for the purpose of applying the first-to-file bar, is whether the first-filed complaint "contained all the essential facts of the fraud later alleged."  *United States v. Millenium Lab'ys, Inc.*, 923 F.3d 240, 252 (1st Cir. 2019) (cleaned up).  The objective of the essential facts test is to determine whether "the statutorily required threshold for notifying the government of the fraud alleged in the later-filed suit" has been met.  *Id.* at 253.

The *CKD* complaint alleged that FMCNA used joint-venture agreements as a way to provide remuneration to physicians in exchange for referrals.  This is the same scheme with the same methodology as alleged here.  *See United States ex rel. Wilson v. Bristol-Myers Squibb, Inc.*, 750 F.3d 111, 118 (1st Cir. 2014); *cf. Duxbury I*, 579 F.3d at 33; *United States ex rel. Westmoreland v. Amgen*, 707 F. Supp. 2d 123, 130 (D. Mass. 2010).  Moreover, the *CKD* complaint alleged that the scheme was nationwide.  (*CKD* Compl. ¶¶ 28, 38-40, 60-65).  The *CKD* complaint therefore contained the essential facts alleged here, thus barring the allegations contained in the amended complaint.

The second question is whether there is an exception to the first-to-file bar that would allow relator's pre-2010 claims to survive.  Relator relies on the Sixth Circuit's holding in *United States ex rel. Poteet v. Medtronic, Inc.*, 552 F.3d 503, 516-17 (6th Cir. 2009) to support the contention that when a first-filed complaint is dismissed on jurisdictional grounds, it cannot bar a later-filed complaint.  However, the First Circuit has rejected the holding in *Poteet*, explaining

that "earlier-filed complaints must provide only the essential facts to give the government

sufficient notice to initiate an investigation into allegedly fraudulent practices" and emphasizing

that "Section 3730(b)(5) contains no exceptions."  *United States ex rel. Heineman-Guta v.*

*Guidant Corp.*, 718 F.3d 28, 35-37 (1st Cir. 2013).  The fact that the *CKD* complaint was

dismissed on jurisdictional grounds is therefore irrelevant.

Accordingly, the claims concerning joint-venture agreements are barred by the first-to-

file rule.

### D.     Pleading Fraud with Particularity under Rule 9(b)

#### 1.     Generally

Because the False Claims Act is a statute directed at fraudulent conduct, Rule 9(b)

"requires both that the circumstances of the alleged fraud and the claims themselves be alleged

with particularity."  *Lawton ex rel. United States v. Takeda Pharm. Co., Ltd.*, 842 F.3d 125, 130

(1st Cir. 2016); Fed. R. Civ. P. 9(b).  The complaint must "set forth with particularity the who,

what, when, where, and how of the alleged fraud."  *U.S. ex rel. Ge v. Takeda Pharm. Co. Ltd.*,

737 F.3d 116, 123 (1st Cir. 2013) (internal quotation marks and citations omitted).  Where the

defendant allegedly caused a third party to submit a false claim to the government, rather than

submitting the false claim itself, a "more flexible" standard applies, under which Rule 9(b) is

satisfied by providing "factual or statistical evidence to strengthen the inference of fraud beyond

possibility without necessarily providing details as to each false claim submitted."  *U.S. ex rel.*

*Kelly v. Novartis Pharm. Co.*, 827 F.3d 5, 13 (1st Cir. 2016) (citing *Duxbury I*, 579 F.3d at 29).

Rule 9(b) may be satisfied "where, although some questions remain unanswered, the complaint

as a whole is sufficiently particular to pass muster under the FCA."  *U.S. ex rel. Gagne v. City of*

*Worcester*, 565 F.3d 40, 45 (1st Cir. 2009).

There is no "checklist of mandatory requirements that each allegation in a complaint must meet to satisfy Rule 9(b)."  *Hagerty ex rel. United States v. Cyberonics, Inc.*, 844 F.3d 26, 31 (1st Cir. 2016).  Nonetheless, the First Circuit has identified some examples of specific allegations that may suffice to state a claim with the requisite particularity.  In an FCA case, these may include "details concerning the dates of the claims, the content of the forms or bills submitted, their identification numbers, the amount of money charged to the government, the particular goods or services for which the government was billed, the individuals involved in the billing, and the length of time between the alleged fraudulent practices and the submission of claims based on those practices."  *U.S. ex rel. Karvelas v. Melrose-Wakefield Hosp.*, 360 F.3d 220, 233 (1st Cir. 2004), *abrogated on other grounds by Allison Engine Co. v. United States ex rel. Sanders*, 553 U.S. 662 (2008).

## 2.    **The Allegations of the Complaint**

The amended complaint describes—in considerable detail—a multi-part scheme to compensate caregivers in return for referrals.  It identifies specific hospitals, doctors, and medical practices that have allegedly benefited financially from the scheme.

However, general allegations of illegal or fraudulent practices, without more, are not sufficient to state a claim under the False Claims Act.  *See Ge*, 737 F.3d at 124 (stating that the court "reject[s][the] approach" sought by the relator, which was "a per se rule that if sufficient allegations of misconduct are made, it necessarily follows that false claims and/or material false information were filed").  Rather, the complaint must allege both the existence of a scheme and the making of particular false claims resulting from the scheme.

Here, the complaint describes in general terms how claims are submitted to Medicare and Medicaid; it describes the various ways in which FMCNA allegedly paid kickbacks for referrals;

and as to each such aspect of the scheme, it alleges that "every" claim or "all" claims were fraudulent.

### a.  General Description of Medicare and Medicaid Claim Systems

First, the complaint alleges in general terms that all claims for reimbursement made to Medicare require the submission of a Form UB-40 (or a substantially similar form) that contains "various data, including the patient's identifying information and line items for each claim sought to be reimbursed."  (Am. Compl. ¶ 29).  It includes a blank example of such a form as Exhibit A.  (*Id.* Ex. A).  It further alleges that defendant is required to submit on an annual basis a Form 265 cost report to Medicare that certifies, among other things, that the services identified in the report (that is, the dialysis services) were provided in compliance with federal law, including the Anti-Kickback Statute.  (*Id.* ¶¶ 30-31).

As to Medicaid, the complaint alleges in general terms that state administrators of the program obtain reimbursement from the federal government by submitting a quarterly Form 64 to the Centers for Medicare and Medicaid Services at Department of Health and Human Services.  (*Id.* ¶ 40).  According to the complaint, "[f]or this reason, claims submitted to the state Medicaid agencies are presented to the federal government within the meaning of the [False Claims Act]."  (*Id.*).

The complaint does not allege, even in general terms, how claims are submitted under the CHAMPUS/TRICARE or CHAMPVA programs.

### b.  Description of False Claims

#### (1)  Hospital Services

As set forth above, the complaint alleges that FMCNA provided dialysis services to hospitals at prices well below cost in order to capture referrals of discharged patients to its

26

dialysis clinics.  (*Id.* ¶ 83).  After describing that scheme in some detail, the complaint alleges the following as to the submission of actual false claims:

> Fresenius'[s] below-cost acute dialysis services constitute illegal remuneration to hospitals, as those services relieved the hospitals of financial obligations they otherwise would have incurred in providing inpatient treatment to ESRD patients and were provided as an illegal inducement for referrals to its outpatient clinics, in violation of the AKS.  *Any claims submitted* for services Fresenius rendered to the patients who were referred to Fresenius clinics through the operation of this scheme *are false claims within the meaning of the FCA.*

(*Id.* ¶ 127) (emphasis added).

The complaint also provides a somewhat more complete description of the false claims for services allegedly provided to Scripps Health, "a large health care system with five hospitals in San Diego, California."  (*Id.* ¶ 154).  As to Scripps, it alleges the following:

> At an average of three treatments per week per patient, those 172 additional patients (whose treatments were paid for by Federal health care programs) received some 26,832 treatments each year.  Because the average dialysis patient stays in treatment for at least five years, the total value of these additional referrals to Fresenius during a five-year period from this single hospital system exceeded an estimated $30 million.  *Every claim for reimbursement* associated with treating these patients that was submitted to Federal health care programs was tainted by kickbacks and *constituted a false claim.*

(*Id.* ¶ 165) (emphasis added).

### (2)   Medical Director Compensation

The complaint further alleges, at considerable length, a scheme to pay medical directors compensation above fair market value in order to induce referrals.  As to the submission of false claims, it makes the following general allegations:

> . . . Fresenius'[s] compensation of its medical directors cannot be explained by competition or market forces.  The difference is also not explained by differing duties and responsibilities, because the duties of dialysis clinic medical directors are defined by uniform federal regulations.  Instead, at least one (if not the only) reason Fresenius pays its medical directors so far above FMV is in order to secure referrals.  At least in part because of receiving this above-FMV compensation from Fresenius, the medical directors for the foregoing facilities and in the

27

foregoing cities have referred patients to Fresenius facilities, the majority of whose care was paid for by Federal health care programs.  *Every claim submitted* to these programs for reimbursement was tainted by kickbacks and thus *constitutes a false claim* under the FCA.

(*Id.* ¶ 204) (emphasis added).

The physicians who had entered into MDAs referred patients to Fresenius facilities based at least in part on remuneration from Fresenius, and these facilities submitted claims to Federal health care programs for reimbursement associated with the treatment of these patients.  *All such claims*, which were tainted by kickbacks, *were false*.

(*Id.* ¶ 229) (emphasis added).

The complaint also describes the compensation paid to a number of specific medical directors around the United States.  (*Id.* ¶¶ 232-35 (Diablo Nephrology in California); *id.* ¶¶ 236-41 (Balboa Nephrology Medical Group in California); *id.* ¶¶ 242-55 (NANI in Illinois); *id.* ¶¶ 256-69 (IMN and other practices in Indiana); *id.* ¶¶ 270-84 (ENA and other practices in North Carolina); *id.* ¶¶ 285-91 (practices in Texas); *id.* ¶¶ 292-307 (practices in Washington state)).  As to each, it provides some specifics as to the scheme (such as referral trends and medical-director compensation levels).  It then alleges, in general terms, that "all" claims from those facilities were "tainted by kickbacks" and therefore constitute false claims within the meaning of the False Claims Act.  (*Id.* ¶ 233 (Diablo Nephrology) ("*Every* claim for reimbursement [FMCNA] submitted to [f]ederal health care programs associated with the treatment of these patients was tainted by kickbacks and therefore false within the meaning of the FCA."); *id.* ¶ 238 (Balboa Nephrology Medical Group) ("*Every* claim . . . constitutes a false claim."); *id.* ¶ 249 (NANI) ("*All* . . . claims . . . constituted false claims . . . ."); *id.* ¶ 257 (Indiana) ("*All* such claims . . . were false . . . ."); *id.* ¶ 274 (North Carolina) ("[E]ach of these claims was false . . . ."); *id.* ¶ 284 (North Carolina) ("*All* such claims . . . were false."); *id.* ¶ 286 (Texas) ("*All* such claims . . . were false . . . ."); *id.* ¶ 293 (Washington state) ("*All* such claims . . . were false . . . ."); *id.* ¶ 299

28

(Washington state) ("*All* such claims . . . were false."); *id.* ¶ 304 (Washington state) ("*All* such

claims . . . were false.") (emphasis added)).

As to some of those medical practices, the complaint provides some amount of additional

detail, although again it does not describe any specific false claims.

As to Diablo Nephrology, the complaint alleges the following:

> In return for these lucrative remuneration relationships, Diablo Nephrology
> referred patients to Fresenius clinics, much of whose treatment was paid for by
> Federal health care programs.  As of August 31, 2012, for example, Diablo
> Nephrology had 585 patients in dialysis at various Fresenius facilities (including
> home dialysis patients), out of which only 6.9% were commercial pay patients.
> The Diablo patients accounted for a total of 104,731 treatments, over 95,000 of
> which were billed to Federal payers at an average rate of approximately $230 per
> treatment, or more than $21,000,000 in Medicare reimbursement per year to
> Fresenius.  Every claim for reimbursement for the treatment of these patients
> constitutes a false claim.  Diablo Nephrology contributed $4,395,000 to
> Fresenius' EBIT in 2012.  *Every claim for reimbursement* Fresenius submitted to
> Federal health care programs associated with the treatment of these patients was
> tainted by kickbacks and *therefore false within the meaning of the FCA*.

(Id. ¶ 233) (emphasis added).

As to Balboa Nephrology Medical Group, it alleges the following:

> As of 2013, Balboa physicians had referred 2,175 patients for dialysis at Fresenius
> facilities, an increase of 274 dialysis patients over the previous year.  Fresenius'
> internal tracking documents show that Balboa's commercial mix was 10.5%,
> which means that over 1,900 of the patients that Balboa referred to Fresenius
> clinics were beneficiaries of Federal health benefit programs such as Medicare
> and Medicaid, whose care was paid for by these programs.  *Every claim for
> reimbursement* for the treatment of these patients *constitutes a false claim.*

(*Id.* ¶ 238) (emphasis added).

As to NANI, the complaint provides a table of Medicare and Medicaid revenue for a

period of five years at seventeen dialysis centers in the Chicago area.  (*Id.* ¶¶ 247-48).  It then

alleges:

> *All* of the Medicare and Medicaid claims submitted to these Federal health plans
> were tainted by the kickbacks Fresenius paid to NANI, which were illegal

remuneration to secure referrals, and violated the AKS.  As such, they *constituted false claims under the FCA*.

(*Id.* ¶ 249) (emphasis added).

Similarly, for North Carolina, the complaint provides a table of Medicaid (but not Medicare) revenue for a period of six years at fourteen dialysis centers.  (*Id.* ¶ 272).  It then provides a table of patients and patient treatments for the same facilities over the same time period.  (*Id.* ¶ 273).  It then alleges:

> Fresenius submitted each of the foregoing hundreds of thousands of claims for reimbursement to Medicaid on approximately 45,756 occasions (3,813 patients x 12 submissions annually).  When Fresenius submitted each claim, it impliedly certified that the corresponding treatments complied with the AKS.  However, all of these treatments were tainted by kickbacks in the form of above-FMV medical director compensation, at least one purpose of which was to induce referrals to Fresenius clinics.  Accordingly, *each of these claims was false within the meaning of the FCA*.

(*Id.* ¶ 274) (emphasis added).

The complaint does not, however, identify a single specific false claim submitted in connection with any of those dialysis centers.

### (3)    **Favorable Leases**

The complaint further alleges a scheme to provide favorable leases to physician groups in order to induce referrals.  As to the claims arising from that scheme, the complaint alleges the following:

> Through the actions alleged above, including the payment of above-FMV rents and provision of below-FMV leases to physicians in order to induce and secure referrals, Fresenius violated the AKS.  Through these practices, Fresenius essentially paid physicians for referrals, payments that violate the AKS.  *All claims submitted* for services Fresenius rendered to the patients who were referred to Fresenius clinics through the operation of this scheme *are false claims within the meaning of the FCA*.

(*Id.* ¶ 331) (emphasis added).

### (4)     Other Aspects of the Scheme

As set forth above, the allegations of the complaint concerning joint-venture agreements, free services to hospitals and patients, and free practice-management services to physicians will be dismissed for failure to comply with the notification and other requirements of the False Claims Act.  In any event, as to those aspects of the alleged scheme, the allegations of the submission of false claims are similarly general.

As to joint-venture agreements, the complaint again alleges in general terms that "all" claims submitted by facilities with joint-venture partners are false claims.

> Not only did Fresenius intentionally enter into JVAs in which its nephrologist partners had greater than forty percent ownership interests, but Fresenius knows, and expects, that the vast majority of revenue for its JV facilities will come from patients referred by these partners.  A significant number of the ESRD patients treated at these facilities were beneficiaries of Federal health care programs, for whose treatment the facilities submitted claims for reimbursement.  Because Fresenius entered into these JVAs based at least in part to induce nephrologists to refer patients to its own clinics, and intentionally violated the strictures set forth in 42 C.F.R. §§ 1001.952(a)(2)(i) & 1001.952(a)(2)(vi), *all of these claims* violated the AKS and *constitute false claims* within the meaning of the FCA.

(*Id.* ¶ 350) (emphasis added).[4]

As to the alleged scheme to provide other services to hospitals, the complaint alleges the following:

> Through the circumstances alleged above, including the provision of services at below cost and at no cost to hospitals in order to induce referrals to its outpatient clinics, Fresenius violated the AKS, which prohibits the payment of remuneration to secure referrals.  Through these practices, Fresenius essentially paid hospitals to secure referrals, in violation of the AKS.  *Any claims submitted* for services Fresenius rendered to the patients who were referred to Fresenius clinics through the operation of this scheme *are false claims within the meaning of the FCA*.

---

[4] The complaint goes on to identify four specific sets of joint-venture arrangements (Balboa, NANI, ENA, and Dallas Nephrology Associates) and again alleges that "all claims" submitted in connection with patients treated by those physicians or facilities were "tainted by kickbacks" and therefore false.  (Am. Compl. ¶¶ 353, 357 (Balboa); *id.* ¶ 359 (NANI); *id.* ¶ 360 (ENA); *id.* ¶ 361 (Dallas Nephrology Associates)).

(*Id.* ¶ 166) (emphasis added).

As to the scheme to provide free or below-cost practice-management services, the

complaint alleges the following:

> Through the valuable free practice management services provided to physicians
> they would otherwise have to pay themselves, Fresenius violated the AKS, which
> prohibits the payment of remuneration to secure referrals. *All claims Fresenius*
> *submitted* for services Fresenius rendered to the patients who were referred to
> Fresenius clinics through the operation of this practice management scheme *are*
> *false claims within the meaning of the FCA.*

(*Id.* ¶ 320) (emphasis added).

### 3.      Analysis

As noted, despite its length and detail, the description of the fraudulent scheme set out in

the complaint, without more, is insufficient to state a claim under the False Claims Act.  There

must be particularized allegations of claims for payment arising from that scheme.  "Evidence of

an actual false claim is the *sine qua non* of a False Claims Act violation."  *Karvelas*, 360 F.3d at

225.  And under Rule 9(b), those claims must be described with some level of specificity.  *See id.*

at 233.   The question here is whether the complaint has met that standard.

To begin, it appears—although the complaint is ambiguous at times—that the Medicare

claims at issue were submitted to the federal government by FMCNA itself, and that the

Medicaid claims were submitted by various state government agencies based on claims that

FMCNA submitted to those agencies.[5]  As to the Medicare claims, therefore, the complaint must

be evaluated according to the ordinary standard applicable in False Claims Act cases, not the

"more flexible" standard applicable where the defendant allegedly caused a third party to submit

false claims.  *See Kelly*, 827 F.3d at 13.  For the sake of simplicity, the Court will focus first on

---

[5] Among other things, the complaint uses the passive voice throughout:  claims "were submitted," rather
than "FMCNA submitted claims."

the Medicare claims.[6]

In substance, the complaint alleges the FMCNA created a nationwide scheme to pay
unlawful kickbacks for referrals at all of its outpatient dialysis facilities; that all claims submitted
for all dialysis services are therefore tainted by kickbacks; and that therefore every claim
submitted by FMCNA during the relevant period was false.  If relator is correct, that means that
the entire government-payor business of FMCNA—which appears to amount to more than $10
billion in revenue per year—is based on fraud.  And it means that relator stands to reap a reward
of 15%-30% of any recovery—an amount that might well be measured in tens of billions of
dollars.

There is, of course, considerable logic to relator's arguments:  if 100% of the business of
FMCNA is tainted by kickbacks, and if 80% or more of the business of FMCNA involves
government payors, it follows that FMCNA must have submitted many false claims.  But
whatever the merits of that argument may be, the law requires more.  *See Kelly*, 827 F.3d at 15
("It may not be irrational to infer that, given [the allegations of the fraudulent scheme], some
false claims . . . for reimbursement were submitted to the government.  But this is not enough to
satisfy Rule 9(b).").

Again, the complaint does not identify a single specific false claim—by Form UB-40, by
patient name, by date, by location, by dollar amount, by billing code, by type of service, or
otherwise.  Nor does it provide any representative or sample claims.[7]

Complicating matters further is the nature of the alleged false claims.  There is no

---

[6] As noted, there are no allegations at all concerning the payments of claims under the CHAMPUS/TRICARE or CHAMPVA programs.

[7] That may, in part, be a result of the fact that relator did not work in any financial or billing capacity, but rather worked as the Director of Acute Market Development for the Fresenius Western Business Unit, and negotiated contracts between FMCNA and hospitals for in-patient dialysis treatment.  (Am. Compl. ¶ 11).

contention that any dialysis services performed were medically unnecessary or excessive, or that those services were performed in a substandard manner.  Nor is there any contention that any dialysis services that were paid by Medicare in fact should have been paid by a private payor.  Based on the allegations of the complaint, it appears that all of the patients in question would have received treatment at a facility operated by FMCNA or a competitor, and all of those treatments would have been paid by Medicare regardless.  It appears, therefore, that the government may have suffered little or no actual financial loss.  The entire basis of the complaint is a theory of tainted referrals; kickbacks paid by FMCNA tainted the physician-referral process, which enabled the company to obtain, unlawfully, a larger share of referrals than it would have otherwise in a properly functioning market.

It is true that a violation of the Anti-Kickback Statute "that results in a federal health care payment is a *per se* false claim."  *Guilfoile*, 913 F.3d at 190.  It does not follow, however, that where there is an AKS violation, the requirement of establishing a false claim evaporates.  One problem lies in the phrase "results in"—that is, the requirement of causation.  Suppose, for example, that in a world free from kickbacks, 25% of the dialysis services business of FMCNA would have been captured by competitors.  Rule 9(b) requires that a relator plausibly allege that specific payments concerning specific patients were caused by the AKS violation—that is, that they were part of the 25% of the claims that resulted from a violation, not the 75% that were not.  Relator here has not attempted to do so.

Certainly it would not be irrational to conclude that the presence of kickbacks taints the entire payment process, so that 100% of the claims may be deemed to have been caused by the violation.  No published case in the First Circuit, however, has ever gone so far.  It might also be entirely rational to shift the burden to the defendant:  that is, once a relator has established the

existence of a kickback scheme, arguably the burden should be shifted to the defendant to prove

that certain referrals were not caused by payment of kickbacks.  Again, however, no case, to the

Court's knowledge, has ever established such a procedure.

In any event, as noted, the complaint does not include a single allegation concerning a

single specific false claim.  To avoid dismissal, the complaint must therefore establish the

necessary degree of particularity, if at all, through allegations of "factual or statistical evidence

that strengthen[ ] the inference of fraud on the government beyond a mere possibility." *Duxbury

I*, 579 F.3d at 29.

To the extent the complaint here provides any factual or statistical evidence as to the

actual false claims, it does so by alleging in a handful of instances that certain types of claims

associated with patients at certain facilities were false.  The complaint alleges that certain

medical practices, such as Diablo and Balboa, benefited financially from medical-director

agreements and joint-venture agreements with FMCNA, that in return they referred patients to

FMCNA facilities, and as a result all of their claims for government reimbursement were false.

Each step in that argument relies on an inference:  first, the inference that the relevant financial

arrangements were intended as kickbacks; second, the inference that every referral to an

FMCNA clinic was made as a result of the kickbacks; and third, the inference that every claim

for government reimbursement was tainted by the kickbacks.  But nowhere does the complaint

identify a specific physician who made a specific referral as a result of a specific unlawful

practice that resulted in a specific false claim.  In substance, it is a dressed-up version of a

generalized allegation:  it essentially alleges that if a practice benefited financially from a

relationship with FMCNA, and if it administered 104,000 treatments, and 93% of those were to

patients who were beneficiaries of government-sponsored healthcare programs, then it submitted

96,720 false claims.  That is not sufficient, under the case law, to state a false claim with particularity within the meaning of Rule 9(b).

To be clear, the dispositive question is not whether FMCNA engaged in an illegal and pervasive scheme to pay kickbacks for referrals.  For present purposes, the Court must assume that it did.  Nor is the issue whether the scheme should, in some fashion, be redressed.  The government had an opportunity to intervene if it chose, and elected not to do so.  And, presumably, it has other weapons in its arsenal for dealing with fraudulent conduct.  The critical question is whether the complaint meets the exacting standard for FCA claims required by law.  Under the circumstances, the Court concludes that it does not.

In summary, the amended complaint fails to state allegations of fraud under the FCA with the particularity required by Rule 9(b).  Accordingly, the motion to dismiss will be granted.

### E.    **Conspiracy**

Because the complaint does not state allegations of fraud under the FCA with the particularity required by Rule 9(b), the conspiracy claim under the FCA must fail as well.

## V.    **Conclusion**

For the foregoing reasons, defendant's motion to dismiss is GRANTED.

**So Ordered.**

/s/ F. Dennis Saylor IV
F. Dennis Saylor IV
Dated:  December 2, 2022              Chief Judge, United States District Court